# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KEVIN B. HARRIS, ) | CASE NO. 8:07CV395 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | MEMORANDUM |
| ) | AND ORDER |
| BRANDON M. BENSON, DOUGLAS ) | |
| COUNTY DEPUTY SHERIFF, ET AL., ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on Defendants' Motion for Summary Judgment. (Filing No. 27.) As set forth below, the unopposed Motion is granted.

## I. BACKGROUND

Plaintiff Kevin B. Harris ("Harris") filed his Complaint in this matter on October 5, 2007. (Filing No. 1.) After initial review, Plaintiff filed an Amended Complaint which, liberally construed, alleges that Defendants failed to keep him safe and failed to fasten a seatbelt around him while transporting him, in violation of the Fourteenth Amendment. (Filing No. 15.) The Amended Complaint contains claims against three individuals, John Does A, B, and C. (*Id.*) Defendants have represented to the court that: (1) John Doe A is Douglas County Deputy Sheriff Brandon M. Benson; (2) John Doe B is Douglas County Deputy Sheriff Austin B. Pratt; and (3) John Doe C is Douglas County Sheriff's Department employee Sergeant Wheeler. (Filing No. 29.) Liberally construing these representations as a Motion to Substitute Parties, the court grants Defendants' request and will direct the Clerk of the court to substitute the parties in the court's records.

Defendants filed their Motion for Summary Judgment on March 4, 2009. (Filing No. 27.) Along with their Motion, Defendants also filed an Index of Evidence and Brief in

Support. (Filing Nos. 28 and 29.) Despite having more than three months in which to do so, Plaintiff did not file an opposition or any other response to Defendant's Motion. (*See* Docket Sheet.)

The party seeking the entry of summary judgment in its favor must set forth "a separate statement of material facts as to which the moving party contends there is no genuine issue to be tried and that entitle the moving party to judgment as a matter of law." NECivR 56.1(a)(1). If the non-moving party opposes the motion, that party must "include in its [opposing] brief a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). Such response must "address each numbered paragraph in the movant's statement" of facts and must contain pinpoint citations supporting the opposition. *Id.* "Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response." *Id.*

Defendants submitted a statement of material facts in accordance with the court's Local Rules. However, Plaintiff has not submitted any "concise response" to those facts. Further, Defendants submitted evidence which was properly authenticated by affidavit. Plaintiff has not. This matter is deemed fully submitted and the material facts set forth by Defendants in their Brief are "deemed admitted" and are adopted below.

## II. RELEVANT UNDISPUTED FACTS

1. On September 25, 2007, Harris was transported from the Douglas County Courthouse ("Courthouse") to the Douglas County Department of Corrections ("DCDC").

2. At all relevant times herein, Harris was being held at the DCDC as a pretrial detainee.

3. Defendant Brandon M. Benson ("Benson") was operating the vehicle used to transport Harris (the "Transport Vehicle") and Defendant Austin B. Pratt ("Pratt") accompanied Benson in the Transport Vehicle.

4. Benson has been employed with the Douglas County Sheriff's Department ("DCSD") for more than 10 years, and has been a sworn Law Enforcement Officer for more than 12 years.

5. During Benson's employment with the DCSD, he has been primarily responsible for transporting prisoners for more than six of the 10 years.

6. Pratt has been employed by the DCSD for more than nine years and has been involved in prisoner transport the entire time.

7. Benson and Pratt have been thoroughly trained by the DCSD on the safe transport of prisoners, have attended a week long seminar sponsored by the U.S. Marshal's Office on courthouse security, which covered the safe transport of prisoners, and have approximately 80 hours of continuing education each year they have been employed with the DCSD.

8. Sergeant Wheeler ("Wheeler") has been with the DCSD for nearly 20 years and has held the rank of Sergeant since 2001.

9. Prisoners held by the DCSD may be transported in standard cruisers, specially equipped cruisers, vans, or larger transport vehicles. These larger transport vehicles are generally utilized to transport prisoners to and from the DCDC to the Courthouse, and are also utilized to transport post-conviction prisoners to Lincoln, Tecumseh, York or other locations.

10. At all times relevant to Harris's claims herein, Wheeler was the Sergeant assigned to the District Court Division and was responsible for the supervision of approximately 15 deputies ("District Court Deputies") who would transport prisoners to and from the Courthouse.

11. There are daily hearings, trials and other matters, and the number of prisoners being transported at any one time may vary. The District Court Deputies may be dispatched at any time to transport a prisoner or group of prisoners.

12. Many of the large transport vehicles are not equipped with shoulder harnesses or lap belts, and are not required to be so equipped. Some of the newer models have this equipment available.

13. When transporting a large number of prisoners to the Courthouse, rather than cuffing each prisoner's hands together, the prisoners are cuffed to each other, leaving each inmate with a free hand. They are then assisted into the bench seating of the vehicle.

14. There are two primary types of large transport vehicles in the DCSD.

15. The Transport Vehicle was a specially equipped vehicle with four rows of bench seating, and two double doors for positioning prisoners in the vehicle. It was formerly a small school bus that the DCSD purchased and specially equipped with two separating cages. One cage separates the District Court Deputies from the middle section of benches, and one cage separates the rear bench that faces toward the rear of the vehicle. It is yellow and unmarked.

16. The Transport Vehicle was equipped with shoulder harnesses, which each prisoner must secure on themselves using their free hand.

17.     In Benson's experience, prisoners rarely, if ever, use the shoulder harnesses because it is only a few blocks between DCDC and the Courthouse. However, they have the option to do so while riding in the Transport Vehicle.

18.     When transporting low security risk prisoners (such as Harris) between the Courthouse and the DCDC, prisoners are typically handcuffed one to another and directed to sit on the benches. District Court Deputies do not enter the prisoner portion of the vehicle.

19.     However, District Court Deputies are trained that even if the safety equipment is available, they should not enter the rear of the van for a number of safety and security reasons, including, but not limited to, being disarmed by a prisoner, being attacked by one or more prisoners or generally losing control of the prisoners perhaps permitting escape or worse. When safety equipment is available, the inmate may secure it him or herself with their free hand.

20.     Benson is very cautious when transporting prisoners. He uses headlights, travels below the speed limit, observes all traffic flow, and remains attentive. He has never been involved in an accident in all of the years that he has been transporting prisoners with the exception of September 25, 2007.

21.     On September 25, 2007, Benson and Pratt served as the District Court Deputies in the Transport Vehicle carrying Harris between the DCDC and the Courthouse. Harris did not use or ask for assistance from Benson or Pratt on how to secure the safety restraint that was provided.

22.     Benson and Pratt were returning prisoners (including Harris) to the DCDC on September 25, 2007, and Harris was seated in the second bench directly behind Benson.

The Transport Vehicle was passing through the intersection on 17th Street in Omaha, Nebraska when Benson observed a vehicle approaching the intersection at a rate of speed that seemed probable the driver would fail to stop at the red light.

23.   Benson immediately began taking evasive action, since the approaching vehicle was on a course directly with the driver's side of the Transport Vehicle. He was able, through moderate acceleration and veering to the open right lane, to alter the point of impact to the rear panel of the Transport Vehicle.

24.   The vehicle that hit the Transport Vehicle began to leave the scene. Pratt pursued that vehicle on foot, informing them that this was a law enforcement vehicle and he must immediately stop his vehicle.

25.   Benson immediately asked the prisoners in the Transport Vehicle if anyone was injured and all answered in the negative. Per Standard Operating Procedure ("SOP"), Benson requested assistance from the Omaha Police Department and his Commanding Officer, Wheeler.

26.   The Omaha Police Department investigated the accident, and issued citations to the driver of the other vehicle.

27.   Included in the Index of Evidence as Exhibit 3 is a true and correct copy of the First Report of Accident consisting of three (3) pages. This document provides details on the accident which is the subject of this lawsuit and lists all nine prisoners that were being transported from the Courthouse to the DCDC.

28.   Included in the Index of Evidence as Exhibit 4 is a true and correct copy of the police reports detailing the September 25, 2007, accident.

29. These two reports reveal that a third party was the sole and proximate cause of the motor vehicle accident. The Transport Vehicle was traveling at a normal rate of speed, and a third party ran a red light, impacting the rear driver's side of the Transport Vehicle. There were two eyewitnesses to the accident.

30. When any transport vehicle is involved in an accident, the District Court Deputy is required to notify their supervisor and the Omaha Police Department. Benson and Pratt did this for the September 25, 2007, accident, pursuant to SOP.

31. The third party driver of the vehicle that caused the motor vehicle collision was cited for violating the traffic signal (running the red light), fictitious plates and no proof of insurance.

32. The driver of the other vehicle was found guilty of disobeying stop lights, unlawful display of plates, and failure to appear or comply on February 28, 2008.

33. Benson did not violate any state or federal law, and indeed, lessened the severity of the accident. He was not cited for any violations of the law as a result of the September 25, 2007, accident.

34. Each prisoner in the Transport Vehicle was individually asked if they were injured, and were offered Rescue Squad assistance and transport. All prisoners, including Harris, reported they were not injured, there were no visible injuries on any prisoner, and none appeared to have any difficulty moving around.

35. A second transport vehicle arrived and Sheriff's Deputy Jones ("Jones") assisted Pratt in moving the prisoners from one vehicle to the other. Benson and Wheeler personally observed Pratt ask each prisoner as they were being transferred if they were injured or would like a Rescue Squad to take them for medical attention. All stated they

were not injured, declined transport, and boarded the other vehicle without difficulty, including Harris.

36. Wheeler commanded Pratt and Jones to escort all nine prisoners to the Medical Department upon arrival at DCDC to be medically cleared.

37. Benson has always been mindful of the responsibility to safely transport prisoners from one location to another, has never been cited for an infraction while transporting a prisoner, has never had a prisoner complain about his driving, and has never been involved in a collision while transporting inmates except on September 24, 2007.

38. In Wheeler's evaluation as the Supervising Sergeant of Benson and Pratt, Wheeler determined that the September 25, 2007, accident could not have been handled in a more professional manner by Benson and Pratt.

39. Wheeler also determined that Benson and Pratt attempted to avoid an accident that was not reasonably foreseeable and not caused or contributed to by them. Benson and Pratt were professional and attentive to each and every inmate offering emergency medical assistance, which was declined by all.

40. Benson and Pratt correctly and efficiently followed the DCSD'S SOP for motor vehicle collisions.

41. The prisoners were taken directly to Correctional Medical Services within the DCDC for evaluation after the accident.

42. A review of his medical records shows that, prior to the Transport Vehicle accident, Harris had sent requests to the DCDC Medical Department stating that he was in need of pain medication and requested a bottom bunk because of the intense back pain from a previous car accident.

43. In his evaluation after the September 25, 2007, accident, the DCDC physician noted that Harris seemed improved since he had last seen him on September 21, 2007. The physician discontinued the Naproxen and prescribed Ibuprofen. Harris reported no injury to medical personnel as a result of the September 25, 2007, accident. (Filing Nos. 28 and 29.)

### III. ANALYSIS

### A. Standard of Review

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir. 1994). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate the allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially the test is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.     Defendants' Motion**

Defendants argue that they are entitled to qualified immunity because Plaintiff has not shown the violation of a constitutional right. (Filing No. 28 at CM/ECF pp. 15-18.) The court agrees and finds that summary judgment in favor of Defendants is warranted.

1.     Legal Standards for Qualified Immunity

Qualified immunity is a question of law to be determined by the court and should ordinarily be decided long before trial. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). "Public officials, of course, are entitled to qualified immunity from liability for damages under 42 U.S.C. § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Domina v. Van Pelt*, 235 F.3d 1091, 1096 (8th Cir. 2000) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In short, "qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information [that the defendant] possessed." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (citations and quotations omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (citations and quotations omitted). Moreover, qualified immunity is "the usual rule" and state actors will enjoy qualified immunity in all but "exceptional cases." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996).

The court focuses on two questions to determine whether a state official is entitled to qualified immunity: "(1) whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a constitutional or statutory right; and, if so, (2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand that their conduct was unlawful . . . ." *Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006) (citations and quotations omitted). Thus, the "initial inquiry is whether the facts as alleged show that the officers' conduct violated a constitutional right. . . . If the facts do not show a violation, [a court] need not proceed further with the qualified immunity analysis." *Brockinton v. City of Sherwood*, 503 F.3d 667, 672 (8th Cir. 2007).

2.      Deprivation of a Constitutional Right

Liberally construed, Plaintiff alleges that Defendants violated his Fourteenth Amendment rights because they did not secure him with a seatbelt while transporting him to a pretrial court appearance. (Filing No. 15.) Claims relating to the treatment of a pretrial detainee "are analyzed under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment." *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005). "However, because, under the Fourteenth Amendment, pretrial detainees are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment, [courts] apply the identical deliberate-indifference standard as that applied to conditions-of-confinement claims made by convicts." *Id.* (quotations omitted). The Eighth Amendment generally prohibits cruel and unusual punishment and provides a "right to safe and humane conditions of confinement." *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). A successful claim under

11

the Eighth Amendment requires that the plaintiff show "[a] denial of safe and humane conditions" resulting "from an officer's deliberate indifference to a prisoner's safety." *Id.* (quoting *Fruit v. Norris*, 905 F.2d 1147, 1150 (8th Cir. 1990)). Deliberate indifference requires "more than mere negligence," but does not require acting "for the very purpose of causing harm or with knowledge that harm will result." *Farmer,* 511 U.S. at 835.

With regard to the provision of seat belts, the Eighth Circuit "has previously held that failure to provide a seatbelt to a prisoner while driving in a manner that puts the prisoner at risk of injury can constitute deliberate indifference to a prisoner's safety and health." *Brown,* 518 F.3d at 558 (quotations omitted). Thus, in order to succeed on a claim under the Fourteenth Amendment for failure to provide seatbelts, a pretrial detainee-plaintiff must "establish that 1) there was a substantial risk of harm to [the plaintiff] and 2) [the defendants] knew of and disregarded the substantial risk" to the plaintiff. *Id.*

Here, Harris has not alleged or proven sufficient facts showing that Defendants were deliberately indifferent to his safety or health. Although Harris was restrained in handcuffs while being transported, he had access to a shoulder harness in the Transport Vehicle. He was given one free hand in order to fasten his shoulder harness, but apparently did not do so and did not seek assistance in doing so. Benson and Pratt were careful and attentive in transporting Harris. Benson drove the Transport Vehicle at a normal rate of speed and was not cited for any violations of the law as a result of the accident. Additionally, Benson likely avoided further harm by taking evasive action. Benson and Pratt asked Harris immediately if he was injured and offered him Rescue Squad assistance and medical attention, which he refused. Defendants were not deliberately indifferent to Harris's safety. Rather, Defendants provided Harris with a shoulder harness which he did

12

not secure, drove cautiously, and reacted appropriately when a third party unexpectedly hit the Transport Vehicle. In light of these findings, Plaintiff has not established that Defendants violated a constitutional right and there is no need to proceed further. Defendants are entitled to qualified immunity and the federal claims against them are dismissed.

### C. Plaintiff's State-Law Claims

Because the court has now dismissed all of Plaintiff's federal claims, the court declines to exercise supplemental jurisdiction over any remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3). Consequently, Plaintiff's Amended Complaint is dismissed in its entirety, but the court will dismiss the state-law claims without prejudice.

IT IS THEREFORE ORDERED that:

1. Defendants' Motion for Summary Judgment (Filing No. 27) is granted and Plaintiff's federal claims against all Defendants are dismissed with prejudice;

2. Plaintiff's state law claims are dismissed without prejudice;

3. A separate judgment will be entered in accordance with this Memorandum and Order; and

4. The Clerk of the court is directed to correct the records of the court as follows: (1) "John Doe A" shall be replaced by "Brandon M. Benson, Douglas County Deputy Sheriff;" (2) "John Doe B" shall be replaced by "Austin B. Pratt, Douglas County Deputy Sheriff;" and (3) "John Doe C" shall be replaced by "Sergeant Wheeler, Douglas County Sheriff's Department."

DATED this 17th day of September, 2009.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge